# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 92 C 3289 | **DATE** | SEP 27 2000 |
| **CASE TITLE** | Ventre v. Datronic | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, the plaintiff class is entitled to recover from Lopinski $9,115,000 less the amount of recovery from the other defendants in this case and the appraised value of the Southwick Office Center. Plaintiff's attorney shall serve a copy of this Opinion and Order to defendant Edmund J. Lopinski, Jr. Status hearing set for Thursday, October 12, 2000, at 9:30 a.m.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | SEP 28 2000 date docketed | 917 |
| | Notified counsel by telephone. | | | |
| X | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 00 SEP 27 PM 7:37 | date mailed notice | |
| dc(lc) | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN VENTRE, MARY O'NEIL, and HAROLD O'NEIL, Individually and as representatives on behalf of a class of similarly situated persons, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 92 C 3289 ) ) HONORABLE DAVID H. COAR |
| DATRONIC RENTAL CORPORATION, and Illinois Corporation; et al., | ) ) ) |
| Defendants. | ) ) |

DOCKETED

SEP 2 8 2000

## MEMORANDUM OPINION AND ORDER

John Ventre ("Ventre"), on behalf of himself and all other limited partners of the Datronic Partnerships, brought this action seeking recovery of misappropriated partnership funds. Among the individual named defendants was Edmund Lopinski ("Lopinski") who was alleged to have converted millions of dollars of partnership money for his own personal use or benefit. A partial settlement of the class action suit was approved in 1993. On 1995, this court entered a default judgment against Lopinski. Thereafter, the court held a default prove-up hearing on the issue of damages. After considering the testimony of the witnesses and reviewing the exhibits and supplemental documents submitted by the parties, the court enters the following findings of fact and conclusions of law.

# I. Findings of Fact

1. On May 18, 1992, John Ventre initiated the instant action on behalf of himself and all other limited partners of the Datronic Partnerships against Datronic Rental Corporation ("DRC") and certain individuals, including Edmund Lopinski, Jr. The class action suit alleged claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and federal securities law, as well as common law fraud claims.

2. DRC was an Illinois corporation with its principal place of business in Schaumburg, Cook County, Illinois. At all relevant times prior to March 4, 1993, DRC was engaged in the business of acquiring capital assets for leasing and, upon expiration of the leases, sale of the capital assets.

3. The Datronic Partnerships were limited partnerships which were offered to the general public as an investment. When an individual purchased a limited partnership interest in one of the Datronic Partnerships, DRC, acting as the general partner, invested the partnership monies in various equipment leases. DRC collected the lease payments, sold the assets at the end of the lease period, and made distributions to the limited partners of the Datronic Partnerships.

4. In 1993, as a result of the partial settlement of the Ventre Class Action, Lease Resolution Corporation ("LRC") replaced DRC as general partner for the plaintiff investors. LRC, on behalf of and for the benefit of the limited partners, acquired all the misappropriated assets owned by Lopinski and others, managed those assets, and upon sale of those assets, applied and allocated all proceeds to the limited partners.

4.  Lopinski is a resident of the State of Illinois. At all relevant times, Lopinski served as the Chairman of the Board and President of DRC and owned substantially all of the outstanding shares of stock of DRC.

5.  On August 14, 1992, plaintiff's class was certified[1] as:

    > [A]ll persons and/or entitled (or their nominees, heirs, successors or assigns) other than Defendants and those in concert with them, who purchased, acquired, or otherwise owned or now own, legally or equitably, limited partnership units or interest . . . .

6.  On April 6, 1995, a default judgment was entered against Lopinski. On October 28, 1999, this court denied Lopinski's motion to vacate the default judgment.

7.  This court held a prove-up hearing on the issue of damages on November 10 and 23, 1999.

8.  At the hearing, plaintiffs offered the testimony of Jeffrey T. McReynolds ("McReynolds"), a Certified Public Accountant and former controller of DRC. McReynolds testified about the following transactions: a 1989 transaction with the Bank of California, a 1990 purchase from the Capitol Lease Investment Corporation ("CLIC"), and a 1991 purchase commonly referred to as the Lease First Portfolio.

9.  McReynolds testified that in 1989, DRC negotiated the purchase of a lease portfolio from the Bank of California on behalf of certain limited partner investors. Originally, the purchase price of that lease portfolio was $40 million[2]. DRC transferred $40 million of

---

[1] The Honorable George W. Lindbergh certified the class. This case was subsequently transferred to this court.

[2] At the prove-up hearing, McReynolds testified using approximate figures. For the sake of simplicity and consistency, the court will use the same figures. The exact figures are set forth

-3-

the plaintiff investors' money into an escrow account at the Bank of California to close the purchase. 11/10 Tr. at 4-5.

10. Subsequent to the transfer of the $40 million into the escrow account, DRC and the Bank of California negotiated a $2.4 price reduction. Accordingly, the DRC paid the sum of $37.6 to the Bank of California to purchase the lease portfolio. The $2.4 million price reduction was not returned to the plaintiff investors. Instead, the money was disbursed to various employees or agents of the DRC, including approximately $1.5 to Lopinski. 11/10 Tr. at 5-6.

11. McReynolds testified that in 1990, DRC negotiated the purchase of a lease portfolio from CLIC for the price of $62.6 million. DRC transferred $66 million of plaintiff investors' funds to an escrow account to close the CLIC transaction. After further negotiations between DRC and CLIC, only $59.1 million was disbursed toward the purchase of the CLIC portfolio. 11/10 Tr. at 6-7.

12. The difference of $6.9 million was not returned to the plaintiff investors, but was misappropriated by Lopinski for his own personal benefit as follows:

   a. $3.5 million was expended on an investment in a limited partnership known as 1445 North State Parkway, in which Lopinski had a 45% interest; and

   b. $3.4 million went toward the purchase of an office building known as Southwick Office Center. Lopinski was a 50% beneficial interest in the land trust that held title to the Southwick Office Center. 11/10 Tr. at 8-9.

---

in plaintiffs' Exhibit A.

13. McReynolds also testified that in 1991, DRC entered into an agreement to purchase a lease portfolio commonly known as the Leasefirst Portfolio. The purchase price was set at $35 million. DRC transferred $44.2 million in plaintiff investor funds to a holding account to close the Leasefirst Portfolio deal, but only $35 million was actually disbursed to complete the purchase of the portfolio. 11/10 Tr. at 9-10.

14. The remaining $9.2 million was not returned to the plaintiff investors, but was misappropriated by Lopinski for his personal benefit as follows:

   a. $2 million was used to fund the remainder of the Southwick Office Center transaction;

   b. $4.5 million was used to purchase two yachts which were either titled to Lopinski or a separate corporation which he owned and controlled;

   c. $1 million was used to purchase a condominium apartment on Lake Shore Drive;

   d. $2.5 million was used to purchase an airplane whose title was held by Datronic Aero Corporation, which was controlled by Lopinski; and

   e. $750,000 was used to purchase and improve real estate in Barrington Hills. 11/10 Tr. at 10-11.

15. McReynolds testified that the plaintiff investors sustained additional damages of $2.275 million for construction of a yacht that had been purchased by DRC under a contract to construct. He explained that the costs were incurred as a requisite to selling the yacht. 11/10 Tr. at 13.

16. Lopinski also testified and offered evidence on the issue of damages. Lopinski admitted that the $2.4 million discount in the Bank of California transaction was never transferred

back to the individual investors and that it was disbursed as a "fee" to DRC. 11/23 Tr. at 33, 59. He claimed that he did not recall if these "fees" were diverted to him and the other DRC partners. 11/23 Tr. at 60.

17. Lopinski also conceded that at least $198,900 of the $8 million left in the CLIC closing escrow account went to purchase his residence in Barrington Hills. Lopinski admitted that two payments of $4,589.093 and $535,000 went to purchase the Southwick Office Building of which he was a 50% beneficiary of the land trust that held title. Lopinski further admitted that $3.35 million was invested in 1445 North State Parkway and that he was a 45% owner of the 1445 North State Parkway limited partnership. 11/23 Tr. at 61-62.

18. Lopinski admitted that of the roughly $9 million remaining in the Leasefirst closing escrow: (a) at least $600,000 went toward the purchase of the Southwick Office Center; (b) $2,771,575 went to purchase the airplane; (c) $955,000 went to purchase his Lake Shore Drive condominium; (d) $3.7 million went to purchase two yachts; and (e) that two payments went toward the purchase of his Barrington Hills property. 11/23 Tr. at 63-65.

19. Plaintiffs claim gross damages amounting to roughly $20 million, including the above three transactions and the yacht-related expenses. 11/10 Tr. at 13.

20. Plaintiffs have realized recoveries of $10,391,000.00 from the sale of the misappropriated assets. The plaintiff class recovered $1.267 million from the Leasefirst accounts. LRC also obtained settlements with Datronic's two employee dishonesty insurance carriers for $1.5 million. In 1993, the LRC sold a number of assets, including the Lake Shore Drive condominium, and recovered $762,000. $1.2 million was derived from the sale of the

-6-

1445 North State Parkway property. After construction, the yachts were sold for $5.7 million. The Barrington Hill properties were also sold for $1 million, with those proceeds reflected as a cash recovery in the Fund, Inc. account. 11/10 Tr. at 14-16.

21. Plaintiffs claim damages in the amount of $9,115,000, which is the difference between the $20,046,000 in sustained losses and $10,931,000 in mitigation.

22. The LRC presently holds the Southwick Office Center for the benefit of the limited partners. Although the building has not been sold, it is being rented. No recent appraisals have been conducted. 11/10 Tr. at 17. A 1992-93 appraisal valued the building at approximately $5 million. At that time, an offer of $4.8 million was made for the building, but rejected because the net recovery to the partnerships would have been limited to $3 million after the payments to the lien holder and mortgage holder. 11/10 Tr. at 32.

23. The class has reached settlements with numerous defendants in the underlying case. The law firm of Siegan, Barbakoff & Gomberg, which was involved in the 1989 Bank of California transaction, was a named defendant in this case. The class settled its claim against the firm, resulting in a recovery for the firm's negligence in the transaction. 11/10 Tr. at 52. The class also obtained recoveries against its accounting companies, Weiss and Company and Price Waterhouse. 11/10 Tr. at 56; 11/23 Tr. at 35-36; Exh. BC 10. Judge Lindberg likewise approved the class's settlement with the yacht company Wes Ship, and the continued construction of the yacht and its sale, including the sale price and the amount of the broker's commission. 11/10 Tr. at 53.

24. In addition, the plaintiff class has settled with several individual defendants. Upon settlement with Gary Morgan, the plaintiff class recovered Morgan's interests in the Southwick building, 1445 North State Parkway property, and other assets. That settlement was approved by the court. 11/10 Tr. at 52. Likewise, the plaintiffs' settlement with defendants Ballard and Van Scoy was approved by the court. 11/10 Tr. at 53.

25. Lopinski offered the testimony of William Krueger, currently an associate minister at a church and a CPA who formerly worked for Datronic. Krueger was asked to testify as to the contents of the documents tendered by Lopinski, but he was incompetent to testify as to the majority of those documents because he had no personal knowledge of them other than being presented with them in court. See, e.g., 11/23 Tr. at 9. Thus, Krueger's testimony offered little by way of substance.

## II. Conclusions of Law

1. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337, 18 U.S.C. § 1964 (RICO), 15 U.S.C. § 78aa (Securities Exchange Act of 1934 and Rule 10(b)(5)). This court also retains supplemental jurisdiction over state common law and statutory claims under 28 U.S.C. § 1367.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), the Securities Exchange Act, and the RICO statute, 18 U.S.C. § 1965.

3. On April 6, 1995, this court found that Lopinski was in default and entered a default judgement against him.

4. A default judgment establishes, as a matter of law, that a defendant is liable to the plaintiff as to each cause of action alleged in the complaint. See United States v. DiMucci, 879 F.2d 1488, 1497 (7th Cir. 1989). Federal Rule of Civil Procedure 55(b)(2) provides that "[i]f, in order to enable the court to enter judgment or to carry it into effect, it is necessary . . . to determine the amount of damages . . . the court may conduct such hearings . . . as it deems necessary and proper . . . ." Fed. R. Civ. P. 55(b)(2).

5. The court finds the testimony of Jeffrey McReynolds to be credible and well-supported. In contrast, the court finds that Lopinski's testimony is not credible. The court accordingly resolves all doubts against Lopinski.

6. At the outset, the court notes that Lopinski admits to the bulk of the losses sustained by plaintiffs. Lopinski concedes that $2.4 million in the Bank of California account was not transferred to the plaintiff investors. Additionally, he admitted to using for personal expenditures a total of $16 million from the CLIC and Leasefirst accounts. In light of these admissions, Lopinski's asserted defenses are largely self-defeating.

7. Lopinski's arguments can be broadly categorized into the following four areas. First, he challenges the liability attributed to him. Lopinski also objects to the amount of recovery obtained by the LRC through its sale of assets. Moreover, Lopinski seeks credit for the expenses incurred by the DRC as well as for the settlements achieved in the underlying suit against other defendants.

8. Lopinski's testimony and overall defense often stray to the issue of liability. See, e.g., 11/23 Tr. at 33-34, 36-39, 46-48, 48-52; Def. Memo. of Facts Relative to Pl.'s Liability Claim, at 2-3 (arguing that $2.4 million fee taken in good faith upon representations made

by law firm); Def. Memo. of Supplemental Info. Relative to Alleged Loss, at 6-7 (attributing depletions in CLIC account to Morgan). However, liability has already been established. To the extent that Lopinski advances attacks on the matter of liability, those are disregarded by the court. Lopinski also refutes loss figures tendered by the plaintiffs' witness. Lopinski testified, for example, that Krueger and Morgan transferred roughly $4 million to the income funds, but McReynolds attributed those amounts to income from the underlying leases. 11/23 Tr. at 54, 55. See also 11/23 Tr. at 57 (Lopinski's assertion that McReynolds' figures were incorrect as they pertain to the amount diverted from the Bank of California funds toward the purchase of the yachts); Def.'s Memo of Facts Relative to Alleged Loss ("Alleged Loss Memo"), at §3B (blanket denial of plaintiffs' claimed losses of §2.3 million resulting from CLIC payments). Because the court is not convinced of Lopinski's credibility, the damage calculations offered by the plaintiffs will be utilized over Lopinski's objections.

9. Lopinski cites to several transactions entered into by the LRC and argues that but for the LRC's negligence, a higher recovery could have been had. For instance, Lopinski claims that according to his calculations, the LRC relinquished $9.2 million in profits by canceling the CLIC lease business. 11/23 Tr. at 39. He asserts that certain assets, including the Lake Shore Drive condominium, were not sold at full value. 11/23 Tr. at 57. Lopinski seeks credit for the resulting "losses" to the plaintiffs' investment funds. See also Alleged Loss Memo, §4 (plaintiffs could have recovered more for the sale of the two yachts); §5 (LRC negligently failed to collect outstanding loan); §6 (loss on

repossession of property) §7 (LRC negligent in managing business of funds); §9 (negligent approval of bulk payment).

10. The court finds that Lopinski's allegations as to the LRC's mismanagement amount to nothing more than mere speculation. Simply pointing to the disparity in the purchase and selling prices of property does not conclusively demonstrate the LRC's negligence. Lopinski's contentions generally are not well supported and do not warrant a reduction in the amount of damages.

11. Lopinski also seeks credit for millions of dollars of expenses incurred by Datronic in generating lease income for the plaintiffs. 11/23 Tr. at 15 ($421,000 earned fees), 34 ($645,000 in costs incurred by Datronic), 55-56 ($1,427,577 operating expenses). Such expenditures should be credited to Datronic, however, and not to Lopinski. Accordingly, the cited expenses will not be considered a mitigating factor.

12. Lastly, Lopinski seeks mitigation for settlements and judgments secured by the class. McReynolds's figures do not appear to have accounted for these recoveries from the other defendants. See 11/10 Tr. at 53 (describing settlements reached with various defendants). Any damages assessed against Lopinski, however, should account for such recoveries.

13. On a final note, the Southwick Office Center is presently in the possession of the limited partners. Upon sale of the property, the net proceeds realized would be a further recovery and set-off against the amount of judgment entered against Lopinski.

14. The class is entitled to recover from Lopinski $9,115,000 less the amount of recovery from the defendants in this case and the appraised value of the Southwick Office Center. The plaintiffs shall submit to the court an accounting of the recoveries procured from the

defendants with whom settlements have been reached and against whom judgments have been entered. The total amount of recovery will be deducted from the $9,115,000 in damages sustained by the plaintiff class. In addition, the plaintiffs are directed to obtain an appraisal of the Southwick Office Center. The appraised value of the building will be further set-off against the damages assessed against Lopinski.

**Enter:**

_____

**David H. Coar**

**United States District Judge**

Dated: **SEP 2 7 2000**